**GTE MOBILNET OF SOUTH TEXAS LIMITED PARTNERSHIP,**
Appellant,

v.

**TELECELL CELLULAR, INC.,** Larry Feingersh d/b/a Discount Communications, Inc., and Feingersh Young Interests, Inc., Appellees.

No. 01–94–00760–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 10, 1997.

Rehearing Overruled June 11, 1997 and
Dec. 11, 1997.

Steven Zager, Gregory S. Coleman, Houston, for Appellant.

Franci N. Crane, James T. McCart, Houston, for Appellees.

Before ANDELL, COHEN and WILSON, JJ.

## OPINION ON REHEARING

ANDELL, Justice.

The appellees have filed a motion for rehearing and a motion for rehearing en banc.

We deny both motions, but withdraw our previous opinion and issue this one in its stead in order to address some of the appellees' rehearing arguments. The disposition of the case remains the same.

The appellees obtained a jury verdict against the appellant in a multi-cause of action lawsuit. We reverse and remand in part, reverse and render in part, and affirm in part.

### Fact Summary

The appellees are authorized agents of GTE Mobilnet (Mobilnet), a limited partnership which consists of several local telecommunications companies. Mobilnet provides cellular telephone service to its customers, who are solicited for Mobilnet by its agents. In return for this solicitation, Mobilnet pays its agents a commission.

The appellees have been authorized agents of Mobilnet since 1987. The appellees' initial agency agreement expired in the fall of 1989, and they began negotiations with both Mobilnet and Houston Cellular, Mobilnet's competitor, for a new agency agreement. During the negotiations with Mobilnet, the appellees and Mobilnet agreed on an addendum to the appellees' agency agreement. Paragraph seven of the addendum states as follows:

> *Schedule 2, Agent Commission Plan*: In the event any other GTE Mobilnet agent signs an Agency Agreement containing a Schedule 2, Agent Commission Plan, with substantially and materially better terms, Agent shall be presented with an opportunity to have said Schedule 2 substituted for the Schedule 2 contained herein.

The appellees signed with Mobilnet, rejecting Houston Cellular.

In the summer of 1992, the appellees complained to Mobilnet that Mobilnet was engaging in promotions with another of its agents while not offering the same promotions to the appellees. Mobilnet told the appellees that (1) these promotions did not fall under paragraph seven, and (2) the appellees had substantially the same schedule two as the other agent. The appellees asserted to Mobilnet that paragraph seven entitled them to every benefit, regardless of its nature, that Mobil-

net offered any other agent. Mobilnet, on the other hand, maintained that the appellees were entitled to the best schedule two enjoyed by any other agent, but not to any other benefits such as promotions that Mobilnet might provide to another agent.

This lawsuit followed shortly thereafter. The appellees brought claims for breach of contract, DTPA violations, fraud, breach of the duty of good faith and fair dealing, and tortious interference with business relations. The jury found for the appellees on their breach of contract, DTPA, fraud, and breach of the duty of good faith and fair dealing claims.

### Is Paragraph Seven Ambiguous?

In its first point of error, Mobilnet asserts that the trial judge erred by finding paragraph seven ambiguous, and because it is not ambiguous, Mobilnet is entitled to judgment on all the appellees' claims. The trial judge found paragraph seven ambiguous, and submitted the issue of its interpretation to the jury. *See Radx Corp. v. Demy*, 658 S.W.2d 298, 301 (Tex.App.—Houston [1st Dist.] 1983, no writ) (holding that when a contract is ambiguous, the question of its true meaning is one for the trier of fact).

■■■ Whether a contract is ambiguous is a question of law. *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 739 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Radx Corp.*, 658 S.W.2d at 301. In determining ambiguity, our "primary concern is to ascertain and give effect to the intentions of the parties *as expressed in the instrument* ." *Radx Corp.*, 658 S.W.2d at 301 (emphasis added); *accord Stephanz v. Laird*, 846 S.W.2d 895, 899 (Tex.App.—Houston [1st Dist.] 1993, writ denied). If a contract is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Stephanz*, 846 S.W.2d at 899; *Radx Corp.*, 658 S.W.2d at 301.

■■■ We hold that paragraph seven in not ambiguous. We agree with Mobilnet that its meaning is plain: should any other Mobilnet agent sign in the future an agency agreement that contains a more favorable agent commission plan than the agent commission plan agreed to by the appellees, Mobilnet will present the appellees an opportunity to substitute the more favorable agent commission plan for their own agent commission plan. This is the message clearly expressed in paragraph seven. Because paragraph seven is worded so that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous. *See Stephanz*, 846 S.W.2d at 899; *Radx Corp.*, 658 S.W.2d at 301. We conclude that the promotions the appellees complain about do not fall within paragraph seven.

■■■ The appellees present three arguments in response to Mobilnet's contention that paragraph seven is not ambiguous. First, they point out that some of Mobilnet's own employees did not agree about the meaning of paragraph seven, and that some of those employees thought the language was unclear. However, as we held in *Affiliated Capital Corp. v. Southwest, Inc.*, 862 S.W.2d 30 (Tex.App.—Houston [1st Dist.] 1993, writ denied), the parties' interpretations of the contract are irrelevant if the meaning of the contract is plain from its face. *Id.* at 33; *accord Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981). A court errs if it looks to how the parties interpreted the contract when the meaning of the contract is clear from its language. *Sun Oil*, 626 S.W.2d at 732.[1]

Second, the appellees contend that, because another section of the agency agreement already provided the same content Mobilnet claims was provided in paragraph seven, Mobilnet's construction contradicts the presumption that the parties to a contract intended every clause in their contract to have some effect. The appellees rely on *Westwind Exploration, Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex.1985).

---

1. We also note that "[m]ere disagreement over the meaning of a provision in the contract does not [] make it ambiguous." *County of Maverick v. Texas Ass'n of Counties Workers' Compensation Self–Insurance Fund*, 852 S.W.2d 700, 705 (Tex. App.—San Antonio 1993, writ denied) (citing *Sun Oil*, 626 S.W.2d at 732).

We recognize the presumption of *Westwind* and the cases in its line, but the purpose of the presumption is to ensure that courts will not construe a contract in a way that makes a provision *meaningless*. *See id* .; *County of Maverick*, 852 S.W.2d at 705. Our construction does not render any provision meaningless. Furthermore, even if our construction of paragraph seven means that it has the same meaning as the other section of the agency agreement, there is no rule prohibiting a construction under which two provisions have the same or similar meanings. If one provision is construed to mean the same thing as another, there is an overlap; however, the mere existence of an overlap does not mean that one of the provisions is necessarily meaningless.

█ Third, the appellees urge that we should construe paragraph seven against its drafter, Mobilnet. The rule of construing a contract against its drafter, however, does not apply if the contract is unambiguous. *Kincaid v. Gulf Oil Corp.*, 675 S.W.2d 250, 256 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *see Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1043 (5th Cir.1991) (observing that "a contract generally is construed against its drafter only as a last resort—i.e., after the application of ordinary rules of construction leave a reasonable doubt as to its interpretation"). Paragraph seven, as we held above, is unambiguous.

█ In light of the judge's error in not construing paragraph seven as a matter of law, but instead submitting the issue to a fact finder, we reverse and remand the breach of contract claim. We cannot say the judge's error was harmless, because the jury predicated its finding that Mobilnet breached the contract on its finding that the interpretation urged by the appellees was correct. TEX. R.APP.P. 81(b)(1).

On rehearing, the appellees argue that *latent* ambiguity was "[t]he primary issue at trial." As Mobilnet correctly points out in its response, until the appellees raised the issue of latent ambiguity in their motion for rehearing en banc, the issue had never been presented to us.

█ Furthermore, latent ambiguity appears

when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. For example, if a contract called for goods to be delivered to "the green house on Pecan Street," and there were in fact two green houses on the street, it would be latently ambiguous.

*National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520, 520 n. 4 (Tex.1995). When a latent ambiguity arises, the focus shifts to "the facts and circumstances under which the agreement was made[.]" *Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n*, 611 S.W.2d 706, 708 (Tex.Civ.App.—San Antonio 1980, no writ) (cited with approval in *National Union*, 907 S.W.2d at 520). Yet, as Mobilnet points out in its response, the "[a]ppellees, in their search for a latent ambiguity, point not to circumstances surrounding the drafting of the contract in 1989, but to a string of alleged circumstances from 1990 to 1993, after the contract was already in effect." There is no latent ambiguity here.

In its brief, Mobilnet asked that we render judgment for it on the appellees' breach of contract claim, but we decline to do so. Our agreeing with Mobilnet's construction of the contract does not dispose of the appellees' breach of contract claim; it just means that the appellees' claim is for the breach of paragraph seven as we have construed it—that is, according to its plain meaning, which does not include the disputed promotions—in this opinion. That particular issue—whether, if any other Mobilnet agent signed, after the effective date of the agency agreement agreed to by the appellees, an agency agreement containing a schedule two agent commission plan with substantially and materially better terms than the schedule two agent commission plan contained in the appellees' agency agreement, the appellees were given the chance to substitute the better schedule two agent commission plan for their own—has not been tried. Fact questions that were not addressed in the past trial, because they were not at issue under the trial court's

erroneous construction of the contract, remain to be addressed in a future proceeding. We remand the breach of contract claim for a trial on whether Mobilnet breached paragraph seven as unambiguously written.[2]

We sustain point of error one insofar as Mobilnet asks us to hold that paragraph seven is unambiguous; we overrule it to the extent that Mobilnet asks us to reverse and render, as opposed to reverse and remand, the appellees' breach of contract claim.

■■■ We are also presented with an issue concerning the trial judge's jury instruction on the issue of ambiguity. As part of her instruction on ambiguity, the judge instructed the jury that "[i]f there is a reasonable doubt as to which interpretation of a contract provision best fits the parties' intentions, you should use the interpretation that is the least favorable to the party who drafted the contract." We are aware of no authority for such a jury instruction. The principle of construing a contract against its drafter is part of the "rule *contra proferentem*," which is a rule applied by courts when construing a contract as a matter of law. *See Smith v. Davis*, 453 S.W.2d 340, 344–45 (Tex.Civ. App.—Fort Worth 1970, writ ref'd n.r.e.). Even then it is to be used only as a last resort. *Id.* at 344. The rule is not involved in making a fact finding about what the parties intended.

■■■ The judge's use of the rule as a jury instruction improperly raised Mobilnet's burden before the jury. There was much specific testimony that Mobilnet drafted paragraph seven. Thus, in order to persuade the jury to accept its interpretation of paragraph seven, Mobilnet had to prove *beyond a reasonable doubt* that its interpretation was correct. Issues of fact in a civil case, however, are only to be resolved by a preponderance of the evidence. *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex.1994).

On rehearing, the appellees contend that the trial judge was correct in submitting the instruction to the jury. They state:

> The trial court's instruction correctly stated the law. In fact, the instruction was taken almost verbatim from a Texas case, *Republic Bankers Life Ins. Co. v. Wisdom*, 488 S.W.2d 470, 472 (Tex.App.—Fort Worth 1972, writ ref'd n.r.e.); *see also Temple–Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex.1984).

There is no doubt that the instruction was essentially a correct *statement of the law*. Whether it was proper to *instruct the jury* on this principle, however, is a completely different issue.

The type of argument that the appellees make was considered and rejected in another case from this Court: *Maddox v. Denka Chemical Corp.*, 930 S.W.2d 668 (Tex.App.—Houston [1st Dist.] 1996, no writ). In *Maddox*, the trial court instructed the jury that "[t]he general rule is that an owner does not have a duty to see that an independent contractor performs work in a safe manner" and that "[o]ne who entrusts work to an independent contractor, but who retains the right to control of [sic] any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care...." *Id.* at 670.

The appellee in *Maddox* argued that the instructions were proper "because the instructions correctly state the law." 930 S.W.2d at 671. This Court responded: "That fact, however, does not make them appropriate. *Every correct statement of the law does not belong in the jury charge.*" *Id.* (emphasis added). We cited *Acord v. General Motors*

---

2. This was also our disposition on this issue in our original opinion. Mobilnet did not move for rehearing, and so has not asked us to reconsider our decision to remand this claim instead of rendering judgment for Mobilnet on it.

In their motion for rehearing en banc, the appellees state that the trial court has already tried the breach of contract claim under the true meaning of the contract. The appellees write that the trial court "restat[ed] that paragraph verbatim[.]" However, neither our previous opinion nor this opinion states that the trial court erred in not submitting the contract language to the jury accurately, i.e., that the judge mixed up the words of the contract. What our previous opinion stated, and what this one also states, is that the meaning of the contract, i.e., whether paragraph seven includes the disputed promotions offered to other agents, should not have been submitted to the jury in the first place, because the language was unambiguous.

*Corp.,* 669 S.W.2d 111, 116 (Tex.1984), where the supreme court "explicitly approve[d] the Pattern Jury Charge's issue and instruction for defective design cases, and disapprove[d] the addition of any other instructions in such cases, however correctly they may state the law under § 402A...." *Id.* Even though the trial court's instruction correctly stated the law, we held that the text in the instruction "does not belong in a jury charge." *Id.*

Neither *Republic Bankers* nor *Temple–Eastex,* the cases relied on by the appellees, authorizes the instruction at issue here. *See Maddox,* 930 S.W.2d at 671 (noting that *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985), the case relied on by the appellee in *Maddox* as authority permitting the instruction we held improper in that case, did not in any way authorize the instruction). In fact, there is *no Texas case* that authorizes such an instruction to the jury. The appellees state that they "supplied the panel with ample authority for submission of just such an instruction" in a letter-brief. The letter-brief cited 11 cases, but none were from Texas. It is also worth noting that the Texas Pattern Jury Charges *do not include* such an instruction.

■■■ The text at issue does not belong in a jury instruction for at least two reasons. First, as noted above, it elevates the drafter's burden of proof to beyond a reasonable doubt, because the instruction tells the jury that if it has a reasonable doubt about which party's interpretation of the contract is correct, vote against the drafter. Second, the text tells the jury that, if the issue of which party's interpretation of the contract is correct is a close call, just remember who drafted the contract, and go with the other party's interpretation. *Cf. Maddox,* 930 S.W.2d at 671 (criticizing jury instruction that "landowners generally have no duty to make contractors perform safely" because that "is like saying, 'Generally, owners win cases like this because they have no duty'"). This encourages the jury not to resolve the sometimes close question of which party's interpretation is correct by carefully weighing and analyzing the evidence of the parties' intentions, but to vote for the interpretation offered by the party who did not draft the contract,

instead. *Cf. Maddox,* 930 S.W.2d at 671–72 (criticizing jury instruction that "landowners generally have no duty to make contractors perform safely" because it "tells the jury how th[e] case should come out, *i.e.,* how it should vote, as a 'general rule'"). A jury instruction should not offer the jury an "easy way out" to take in the event that the issue is a close one. Further, when a jury instruction encourages the jury to give undue weight to certain evidence—here, the evidence on who drafted the contract—the instruction constitutes an impermissible comment on the weight of the evidence. *See Redwine v. AAA Life Ins. Co.,* 852 S.W.2d 10, 14 (Tex.App.—Dallas 1993, no writ).

For these reasons, as in *Maddox,* "[t]his case is a good example of the rule that every correct statement of the law does not belong in a jury charge." *Maddox,* 930 S.W.2d at 671. The trial judge erred by giving the instruction to the jury.

### Do the Appellees have a valid DTPA Claim?

In its second point of error, Mobilnet argues that the trial judge erred in refusing to grant judgment for Mobilnet on the appellees' DTPA claim. Because the appellees were not consumers of Mobilnet for the purposes of a DTPA claim, we agree.

■■■ Whether the plaintiff is a consumer under the DTPA is a question of law. *Kenneth H. Hughes Interests v. Westrup,* 879 S.W.2d 229, 234 (Tex.App.—Houston [1st Dist.] 1994, writ denied). A DTPA consumer is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services...." *Id.* (quoting TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987)).

■■■ There are two requirements for establishing consumer status under the DTPA: (1) the plaintiff must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or leased must form the basis of the complaint. *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 351–52 (Tex.1987). The burden of proof on the issue of consumer

status rests with the plaintiff. *Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 910 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

 The appellees list four items which they contend qualify as DTPA "goods or services" and which they assert they purchased from Mobilnet: telephones, administrative and advertising services, and airtime coupons. We do not address whether these items are "goods and services" under the DTPA or decide whether the appellees purchased these items from Mobilnet. Even if the items *are* DTPA "goods or services" that the appellees purchased from Mobilnet, these items do not meet the second requirement for consumer status—they did not form the basis of the appellees' DTPA complaint. The appellees' live petition at the time of trial states only one basis for their DTPA complaint:

> During the negotiation and execution of the agency agreements, [Mobilnet] made false statements and material misrepresentations to plaintiffs and omitted material facts. Accordingly, [Mobilnet] has engaged in false, misleading, and deceptive acts as defined in DTPA. . . .

*Central Texas Hardware, Inc. v. First City, Texas–Bryan, N.A.,* 810 S.W.2d 234 (Tex.App.—Houston [14th Dist.] 1991, writ denied), is a similar case. There, the plaintiff based its DTPA claim on the defendant-bank's alleged failure to fund a loan. *Id.* at 236. The defendant received a directed verdict on the DTPA claim. *Id.* On appeal, the plaintiff complained about the defendant's negotiations with the United States Small Business Administration in arguing that the directed verdict was erroneous. *Id.* at 237. The court held that the negotiations were not the services on which the plaintiff's DTPA complaint was based, but were "merely ancillary" to the actual basis of the complaint, the processing of the loan. *Id.*

We reach the same conclusion here. The telephones, administrative and advertising services, and airtime coupons were not the goods or services that formed the basis of the appellees' DTPA complaint; instead, they were at most "merely ancillary" goods or services. We sustain point of error two and render judgment that the appellees take nothing on their DTPA claim.

## Do the Appellees have a valid Fraud Claim?

In its fourth point of error, Mobilnet contends that the trial judge erred in refusing to grant judgment for Mobilnet on the appellees' fraud claim. We agree.

The jury was asked to consider a two-part damages question in regard to the appellees' fraud claim. The first part asked the difference, if any, between the value of what the appellees would have received had Mobilnet not defrauded them and the value of what they actually received. The jury answered "$0.00." The appellees do not attack this finding. The second part asked the amount of "[l]ost profits that were a natural, probable, and foreseeable consequence of [Mobilnet]'s fraud." The jury awarded a total of $2,230,000.

In our previous opinion, we held that a plaintiff cannot recover lost profits in an action for fraud, citing *C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 719 (Tex.App.—Dallas 1989, writ denied); *Hudson & Hudson Realtors v. Savage,* 545 S.W.2d 863, 868 (Tex.Civ.App.—Tyler 1976, no writ); and *Fredonia Broadcasting Corp. v. RCA Corp.,* 569 F.2d 251, 259 (5th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). We held that the jury's award of lost profits as fraud damages could not stand. We wrote:

> Because the jury refused to award fraud damages under one measure, and we have struck down the award of fraud damages under the other measure, there are no fraud damages in this case. We therefore sustain point of error four and render judgment that the appellees take nothing on their fraud claim.

On rehearing, the appellees argue that our holding that lost profits cannot be recovered in a fraud claim is incorrect. There is considerable confusion in the law over this point, but we agree with the appellees.

The cases cited in our previous opinion—*C & C Partners, Hudson & Hudson Realtors,*

and *Fredonia Broadcasting Corp.*—all unequivocally hold that a plaintiff cannot recover lost profits in a fraud case. *C & C* states "lost profits are not recoverable in an action for fraud." 783 S.W.2d at 719. *Hudson & Hudson Realtors* states "lost profits are not recoverable in such an action [referring to fraud]." 545 S.W.2d at 868. In *Fredonia Broadcasting Corp.*, the Fifth Circuit, in reviewing Texas law on what damages can be recovered for fraud, held that the plaintiff "is not entitled to recover lost profits[.]" 569 F.2d at 259.

However, as the appellees contend, a Texas Supreme Court case seems to go the other way, albeit not in decisive terms. In *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983), the court wrote:

> [The defendant] argues there is no evidence to support the jury findings on actual and exemplary damages. [The plaintiff] seeks to recover only "special or consequential" damages, i.e., losses on the sales of the eighteen houses and lost profits thereon. Special damages may be recovered for losses on improvements to property purchased as a result of a misrepresentation.

*Id.* at 933. While this excerpt does not employ the more definite language of the holdings in *C & C Partners, Hudson & Hudson Realtors,* and *Fredonia Broadcasting Corp.*—i.e., it does not specifically say "lost profits are recoverable for fraud"—we believe it does indicate that they are.

■ In *Hoechst Celanese Corp. v. Arthur Bros., Inc.*, 882 S.W.2d 917 (Tex.App.—Corpus Christi 1994, writ denied), the Corpus Christi Court noted the conflict between *C & C Partners* and *Trenholm* and concluded that "fraud can result in lost profits for a service provider that are directly and not too speculatively traceable to the fraud." *Id.* at 928–29. The Fifth Circuit has also cited *Trenholm* as "allowing recovery for lost profits in a fraud action." *Hiller v. Manufacturers Prod. Research Group*, 59 F.3d 1514, 1518 (5th Cir.1995). We conclude that, despite *C & C Partners*, lost profits are recoverable for

fraud based on *Trenholm*, as was held in *Hoechst Celanese* and *Hiller*.

■ Nevertheless, we still conclude that the appellees do not have a valid fraud claim. Tort liability can exist only if Mobilnet's conduct "would give rise to liability independent of the fact that a contract exists between the parties." *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991). Stated another way, if Mobilnet's conduct "would give rise to liability only because it breaches the parties' agreement," the claim can sound only in contract. *Id.*

■ That is the case here.[3] This entire case was about whether the contract entitled the appellees to every benefit that Mobilnet offered all its other agents. Any duty on the part of Mobilnet to convey all the benefits it conveyed on other agents to the appellees arose solely from the contract. In fact, in their brief, when setting out what they contend was evidence of fraud, the appellees referred to statements made by Mobilnet personnel upon entering the contract that Mobilnet would honor *the language of the contract.* The appellees thought "honoring the language of the contract" meant that they would get all the benefits Mobilnet gave its other agents; Mobilnet thought "honoring the language of the contract" meant that the appellees would get only the best schedule two given to any other agent. The appellees sought to obtain what they believed they were due under their *contract* with Mobilnet.

It is true that the appellees *pled* a fraud claim. The plaintiff's pleadings, however, have never determined whether the plaintiff's claim sounds in contract or tort. *International Printing Pressmen & Assistants' Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735 (1946); *see DeLanney,* 809 S.W.2d at 495.

Whether Mobilnet's conduct gives rise to liability depends entirely on the proper interpretation of the contract. The appellees do not have a valid claim for fraud. *See Barbouti v. Munden,* 866 S.W.2d 288, 293–94 (Tex.App.—Houston [14th Dist.] 1993, writ

---

**3.** Mobilnet presented this argument in its brief as an alternative to its argument that a plaintiff

cannot recover lost profits in a fraud case.

denied); *Webber v. M.W. Kellogg Co.,* 720 S.W.2d 124, 129 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

We sustain point of error four and render judgment that the appellees take nothing on their fraud claim.

## Do the Appellees have a valid Claim for Breach of the Duty of Good Faith and Fair Dealing?

In its fifth point of error, Mobilnet contends that the trial judge erred in refusing to grant judgment for Mobilnet on the appellees' claim for breach of the duty of good faith and fair dealing. We agree.

 In order for a plaintiff to have a claim for breach of the duty of good faith and fair dealing, there must be a duty of good faith and fair dealing on the part of the defendant. *Cole v. Hall,* 864 S.W.2d 563, 568 (Tex.App.—Dallas 1993, writ dism'd w.o.j.) (en banc). Texas law does not recognize a duty of good faith and fair dealing in every contract or business transaction. *Id.; see Sanus/New York Life Health Plan, Inc. v. Dube–Seybold–Sutherland Management, Inc.,* 837 S.W.2d 191, 199 (Tex.App.—Houston [1st Dist.] 1992, no writ).

 "Since its inception, the duty of good faith and fair dealing has only been applied to protect parties who have a special relationship based on trust or unequal bargaining power." *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 697 (Tex.1994). This special relationship is "to be imposed only in certain narrowly limited circumstances." *Wheeler v. Yettie Kersting Memorial Hosp.,* 866 S.W.2d 32, 52 (Tex.App.—Houston [1st Dist.] 1993, no writ). "Although often urged to do so, the supreme court has hesitated to extend the duty of good faith and fair dealing to other contexts beyond the special relationship be-

tween an insurance company and its insured." *Id.*

Texas courts have refused to find such a duty in a large variety of situations, including supplier-distributor, mortgagor-mortgagee, creditor-guarantor, lender-borrower, franchisor-franchisee, issuer-beneficiary of letter of credit, employer-employee, and insurance company-third party claimant. *See Cole,* 864 S.W.2d at 568 (collecting cases); *Wheeler,* 866 S.W.2d at 52 (same). In an "ordinary commercial contractual relationship," the duty does not attach. *Central Sav. & Loan Ass'n v. Stemmons Northwest Bank, N.A.,* 848 S.W.2d 232, 239 (Tex.App.—Dallas 1992, no writ).

 Here, we do not have a "special relationship based on trust or unequal bargaining power" between the parties. The record shows that the appellees (1) are successful, experienced businessmen; (2) negotiated and otherwise dealt with Mobilnet at arm's length; (3) negotiated to include several "protective" provisions in the agency agreement because they did not trust Mobilnet, and believed they needed "protection" and "special protection" from Mobilnet;[4] (4) insisted on, and won, several concessions from Mobilnet regarding the terms of the new agency agreement; and (5) were on equal bargaining footing with Mobilnet.[5]

 The appellees contend that paragraph seven *itself* created a duty of good faith and fair dealing on the part of Mobilnet, because "once the agreement was in place . . . [they] had to trust and place confidence in [Mobilnet]" since Mobilnet had "absolute control over information about other agents' deals" and "absolute control over the structure of other agents' deals." However, the duty of good faith and fair dealing is created by the parties' *relationship,* not from the

---

4. For example, appellee Feingersh testified that he wanted one "special provision" to be included in the agency agreement because he "wanted protection that [Mobilnet] wouldn't raise the sales quotas so high as a way of getting out of my contract to not pay me residuals anymore"; another provision so Mobilnet "couldn't come up with some reason to terminate my contract. . . ."; and another "special protection" provision because he "didn't want [Mobilnet] reducing my territory and limiting my ability to grow."

5. When the appellees negotiated the new agency agreement with Mobilnet, they had received a lucrative offer from Houston Cellular. In negotiating with Mobilnet, they used the Houston Cellular offer as leverage to gain more favorable terms, including the insertion of paragraph seven, from Mobilnet in their agency agreement.

terms of their contract. *Natividad,* 875 S.W.2d at 697–98. No "special relationship" exists in this case.

The appellees rely on *Houston Cable TV, Inc. v. Inwood W. Civic Ass'n, Inc.,* 839 S.W.2d 497 (Tex.App.—Houston [14th Dist.] 1992), *judgment set aside "without reference to the merits,"* 860 S.W.2d 72, 74 (Tex.1993), to support their argument that a special relationship exists in this case. The *Houston Cable* court, in dicta,[6] found a special relationship, but found it because the defendant-company was "in the nature of a public service company *and owe[d] their customers a public duty*" in addition to the contractual duties it owed the appellees. *Id.* at 504. By contrast, the duties Mobilnet owes its cellular phone customers are not at issue in this case. Further, like this Court in *Wheeler,* the *Houston Cable* court observed that the special relationship exists mainly in the insurance company-insured context: "Generally, the special relationship creating a duty of good faith and fair dealing is found between an insurance company and its insured, and Texas courts have been reluctant to extend this duty to other contractual relationships." 839 S.W.2d at 504.

The appellees also contend that, under *Sanus/New York Life,* where the defendant has exclusive knowledge of information that is important to the plaintiff, there is necessarily a special relationship. We disagree. In that case, we affirmed the finding of a special relationship where the defendant had exclusive control of information crucial to the plaintiff, but we affirmed the finding based on other factors, as well. 837 S.W.2d at 194. One of those factors was "an imbalance of bargaining power," *id.,* which does not exist in this case.

■■■ That the defendant has exclusive knowledge of information important to the plaintiff does not automatically give rise to a special relationship; rather, it is just one factor to consider in determining whether such a relationship exists. For example, in *Fireman's Fund Ins. Co. v. Murchison,* 937

F.2d 204 (5th Cir.1991), the counter-plaintiff, referred to as "the Trusts," executed a general indemnity agreement in favor of Fireman's Fund to obtain bonding for various construction projects. *Id.* at 206. The Trusts brought a claim for the breach of the duty of good faith and fair dealing based on Fireman's Fund's (1) failure to disclose that certain bonds could be issued; (2) failure to disclose that the Trusts were subjected to millions of dollars of exposure when Fireman's Fund, without notice, issued other bonds; and (3) failure to disclose that claims had been made against the bonds, depriving the Trusts of any right to investigate the claims to see if they were well-founded. *Id.* at 208 n. 2. Despite the fact that Fireman's Fund had exclusive knowledge of facts important to the Trusts, the Fifth Circuit held that there was no special relationship between the Trusts and Fireman's Fund. *Id.* at 209. The court noted that "[t]he Trusts represent a group of very sophisticated businessmen"; that the Trusts were "not in the same position as an insured in relation to an insurance company"; and that "[t]here was no disparity of bargaining power when the [general indemnity agreement] was negotiated." *Id.*

The same elements of sophistication, lack of insured-like vulnerability, and lack of disparity of bargaining power exist here. The mere fact that "one business entity trusts another and relies on their contractual promise to perform the contract does not cause a special relationship." *Central Sav. & Loan,* 848 S.W.2d at 240. We sustain point of error five and render judgment that the appellees take nothing on their claim for breach of the duty of good faith and fair dealing.

### Did the Trial Judge Err by Striking Mobilnet's Counterclaim?

In its seventh point of error, Mobilnet contends that the trial judge erred by striking Mobilnet's counterclaim as a discovery sanction. We agree.

---

6. The court began its discussion of special relationships with the sentence, *"Although unnecessary to support the award of punitive damages in this case,* the jury also found the existence of a special relationship between appellants and appellees, and that appellants had breached their duty of good faith and fair dealing to appellees.". *Id.* at 504 (emphasis added).

On June 18, 1993, the appellees sent a request for production which asked, in request number 40, for "[a]ll documents sufficient to show the identity of [ ] Mobilnet customers who receive the equivalent of or lower rates than the published Multi–User II rate." Thirty days later, Mobilnet responded to the request for production. Mobilnet objected to request number 40 on three grounds, and stated that, "[b]ased on the foregoing objections, no documents will be produced in response to this request."

The appellees filed a motion to compel. However, at the hearing on the motion to compel, the judge took no action on the matter; she did not rule on the motion to compel, otherwise order production, or impose sanctions. At a later hearing, on August 18 and 19, 1993, the appellees raised the issue again. The judge, however, did not reach the issue of request number 40 because she decided it would consume too much time. Rather, she merely stated that she "inten[ded] to impose a sanction for the failure to produce documents or to provide responses to interrogatories prior to trial." She did not rule on the motion to compel, otherwise order production, or impose sanctions.

The matter rested until December 3, 1993. On that day, the judge held a pretrial hearing on the appellees' motion in limine. The appellees raised the issue again, and the judge stated that she was "confident that neither [of Mobilnet's attorneys] has done anything wrong." She told Mobilnet to produce the requested documents by noon on the following Monday (three days later), and advised the attorneys for both sides that "everybody best tell their clients anything that is being held back is going to be presumed to not come in."

Mobilnet produced two boxes of documents before noon on Monday. The judge and the parties discussed Mobilnet's production at a pretrial hearing that day, and the judge made no orders on the matter. The next day, December 7, the appellees moved for sanctions. The judge held a hearing that day to discuss the matter and to hear Mobilnet's motion in limine. During the portion of the hearing devoted to the discovery issue, the judge heard counsel argue and, at the conclusion, asked the appellees whether they wanted to go forward with trial without a resolution to the discovery issue. The appellees stated that they did. The judge then announced that she was "going to table ruling on this." That portion of the hearing ended, and the attorneys and the judge then began to discuss Mobilnet's motion in limine. The judge did not rule on the motion for sanctions or the earlier motion to compel, otherwise order production, or impose sanctions.

The next day, December 8, voir dire began. A jury was chosen, and that afternoon the attorneys made opening statements. The trial proceeded. On December 10, after the end of a morning of testimony, the judge gathered the attorneys at the bench outside the jury's presence and stated that she had considered the matter and was striking Mobilnet's counterclaim. Six days later, she signed an order to that effect, ruling that "Mobilnet may not introduce any evidence relating to the Elite Kar Club, whether relating to [Mobilnet]'s counterclaim or [Mobilnet]'s defenses based on the Elite Kar Club" and that "the portion of [Mobilnet]'s counterclaim concerning the Elite Kar Club is hereby stricken."

The appellees do not argue that the materials Mobilnet produced on the morning of Monday, December 6, were not responsive to their request. Nor did the judge, in her sanctions order or anywhere else, conclude that the materials did not answer the request.

Texas Rule of Civil Procedure 215 authorizes sanctions that "terminate or inhibit the presentation of the merits of a party's claims for decision." *Braden v. Downey*, 811 S.W.2d 922, 929 (Tex.1991). These sanctions include the exclusion of essential evidence and the striking of pleadings. *Id.*

 Here, the judge's sanctions order both excluded essential evidence and struck a claim from Mobilnet's pleadings. Such sanctions, however, may not be imposed unless the trial court has first attempted to secure compliance by employing *lesser* sanctions. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex.1992); *Braden*, 811 S.W.2d at 929;

*F.N. Fausing Trading ApS v. Estate of Barbouti,* 851 S.W.2d 314, 318 (Tex.App.—Houston [1st Dist.] 1992, writ denied). That did not happen here. Thus, the sanctions order must be reversed. *See Chrysler Corp,* 841 S.W.2d at 849; *Braden,* 811 S.W.2d at 929.[7]

■ The appellees argue that the judge *"did* first impose a lesser sanction," when she stated, at the August 1993 hearing, that she intended to impose a sanction for the failure to produce documents prior to trial. However, neither a threat to sanction with nothing more nor the intent to sanction is a sanction. *See* TEX.R.CIV.P. 215(2) (listing the available lesser sanctions, all of which involve the actual *imposition* of a penalty); *Chrysler Corp.,* 841 S.W.2d at 850 (holding that potential exposure to substantial fine was not a "lesser sanction"). We have held that an order to compel that includes a statement in the order that noncompliance will result in dismissal constitutes a lesser sanction, *Andras v. Memorial Hosp. Sys.,* 888 S.W.2d 567, 572 (Tex. App.—Houston [1st Dist.] 1994, writ denied), but that combination does not exist here.

On rehearing, the appellees contend that, in a previous mandamus proceeding, this Court "reviewed the trial court's sanctions order and decided the issue differently." According to the appellees, the same issue was presented to a panel of former Chief Justice Oliver–Parrott and Justices Wilson and .Andell, and that panel declined to grant the motion for leave to file a petition for writ of mandamus without stating reasons. *See* TEX. R.APP.P. 121(c). The opinion was unpublished.

We find no significance in this. The panel that heard this appeal was not bound by an unpublished opinion that declined to grant a motion for leave to file a petition for writ of mandamus for reasons unspecified in the mandamus opinion.

We sustain point of error seven and reverse the trial court's striking of Mobilnet's counterclaim and its prohibition of Mobilnet's evidence relating to the Elite Kar Club.

■ The judge also excluded a letter from Mobilnet to the appellees, on the ground that it was a settlement offer. Mobilnet complains. that this was error; because on remand of this case the issue of the letter's admissibility may well rise again, we address Mobilnet's contention. We agree with Mobilnet.

The letter states, in pertinent part:

> [W]e understand that you believe S & G Distributing has been offered substantially and materially better agent commission plan terms. To address your concerns, this letter sets forth an agent commission plan that can be substituted for your agent commission plan. You can accept this plan.... Alternatively, you may reject this plan.... We do not believe that we are obligated to provide you the opportunity to participate in the agent commission plan set forth in this letter. Among other things, we do not believe that you have fulfilled your promises in the Agency Agreement.

The letter then sets out an "Alternate Agency Commission Plan," and concludes with the following: "This letter is not meant to be an agreement. Rather, if you indicate that you want to participate in this alternative plan, then I will have the legal staff draft a binding agreement."

The appellees sought to exclude the letter under TEX.R.CIV.EVID. 408, which prohibits evidence of attempts to compromise a claim. *See Tatum v. Progressive Polymers, Inc.,* 881 S.W.2d 835, 837 (Tex.App.—Tyler 1994, no writ). The appellees argued, and the judge agreed, that the letter was an offer of settlement. That offers to compromise claims are not admissible is "well-established." *Id.* Mobilnet's letter, however, is not an offer to settle a claim. It does not request that the appellees drop any of their claims or relinquish any of their rights. It does not ask for any concessions or seek to impose any conditions. In fact, the appellees

---

7. We are cognizant of *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993), where the supreme court stated that "[c]ase determinative sanctions may be imposed in the first instance ... when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules." *Id.* at 729. It is not "fully apparent that no lesser sanctions" would have been of assistance here.

accepted the benefits listed in the letter, and in their acceptance explicitly reserved the right to proceed with their lawsuit. They did not give up any of their claims or anything else. The letter was not excludable under rule 408.

On rehearing, the appellees point to their response to the letter, which was "Your settlement offer ... is unacceptable", as "evidence" that the letter was indeed a settlement offer. The appellees offer no authority for the proposition that their subjective *belief* that the letter was a settlement offer is evidence that it *was* a settlement offer. The appellees' response to the letter offers only their legal conclusion that the letter was a settlement offer. It is not evidence that the letter was a settlement offer. *See Kulms v. Jenkins,* 557 S.W.2d 149, 152 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.) (plaintiff's testimony that he was working for defendant on the day of the accident was a legal conclusion, not evidence of employment); *Antonopoulos v. Woolsey,* 392 S.W.2d 194, 196 (Tex. Civ.App.—El Paso 1965, no writ) (intervenor's statement that she was married to the decedent was a legal conclusion, not evidence of marriage).

### The Summary Judgment on Mobilnet's "Morals Clause" Claim

In its twelfth point of error, Mobilnet attacks a summary judgment granted against it on a claim based on the morals clauses of the agency agreement. However, Mobilnet does not support this point with authority or sufficient argument. It is therefore waived. *Metzger v. Sebek,* 892 S.W.2d 20, 45 (Tex. App.—Houston [1st Dist.] 1994, writ denied); TEX.R.APP.P. 74(f)(2).

We overrule point of error 12.

### Other Points of Error

In point of error three, Mobilnet contends that the trial judge erred in refusing to grant judgment for Mobilnet on all of the appellees' claims because lost profits, the only measure of actual damages awarded, were not proved with reasonable certainty.[8] Mobilnet asserts

that it is entitled to judgment on all of the appellees' claims on this ground.

We need not consider this point of error as it relates to the appellees' claims for DTPA violations, fraud, and breach of the duty of good faith and fair dealing, because, on other grounds, we have already rendered judgment for Mobilnet on these claims. We did not, however, render judgment for Mobilnet on the appellees' breach of contract claim, and we would not do so even if we found point of error three meritorious. As noted above, the appellees' claim for the breach of paragraph seven *as unambiguously written* has not been tried. Rendering judgment on that claim before it has even been tried would not be proper.

We decline to consider point of error three.

We decline to rule on Mobilnet's other points of error because it is not necessary to do so in light of our disposition of the points on which we have ruled. Even if we sustained the points of error on which we have not ruled, Mobilnet would not be entitled to any more relief than it has already received.

### Conclusion

We deny the appellees' motion for rehearing and their motion for rehearing en banc. We reverse the judgment on the appellees' breach of contract claim and remand that claim for further proceedings not inconsistent with this opinion. We reverse the judgment on all of the appellees' other claims and render judgment that the appellees take nothing on those claims.

We reverse the judgment on the appellant's counterclaim and remand that counterclaim for further proceedings not inconsistent with this opinion. We affirm the summary judgment on the appellant's "morals clause" claim.

On the appellees' motion for rehearing en banc, SCHNEIDER, C.J., and COHEN,

---

8. *See Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276, 279 (Tex. 1994). The jury awarded lost profits for breach of contract, fraud, DTPA violations, and breach of the duty of good faith and fair dealing.

MARGARET GARNER MIRABAL, WILSON, HEDGES, ANDELL, TAFT and NUCHIA, JJ., voted to deny rehearing en banc.

O'CONNOR, J., voted to grant rehearing en banc.